Case No. 23-5600, L W et al. v. Jonathan Skrmetti et al. Oral Argument, 15 minutes for the appellants, 15 minutes to be shared by appellees. Mr. Hildebrand for the appellants. Thank you. Good afternoon. Good afternoon, Your Honor. Before I begin, I'd like to reserve three minutes of time for rebuttal. Fine. May it please the Court, Clark Hildebrand for the Tennessee bipartisan law to protect Tennessee children from treatments with unproven benefits but lifetime harms. Perhaps most concerningly, WPATH's recommended course of treatment for gender dysphoria, puberty blockers, and cross-sex hormones likely prevents patients from ever experiencing the joys of naturally having kids of their own. Parents do not have a substantive due process right to impose such novel treatments on children suffering from gender dysphoria. So what do you do about, as I understand it, the parties agreed that they would submit their supporting positions, factual positions through declarations and other submissions, and the district court made pretty extensive findings of fact. What do we do with those? So there are two parts, Your Honor. The first is that we agreed to have the experts present their testimony on the papers. What we did not agree to was to have — we'd asked for Vanderbilt to come and testify. We'd subpoenaed them to do so because we thought, especially on the standing issue, it was worthwhile and there was a dispute there about whether or not Vanderbilt would restart treatment if her plenary injunction were granted. I — putting that to the side, what do we do with the judges' findings of fact based upon all the submissions, the factual submissions that it was agreed would be submitted in that fashion? And I'll just elaborate on one of them that I think both Tennessee and Kentucky might wish to have. They don't have the exact same — exact language that this was not experimental medical treatment. This was not new. It was not innovative. And I think what Judge White's asking is, aren't we required to respect that given that district court judges make findings? Where the evaluation was done on the papers, and as we explained in our brief, it's — this court is in as good a position to evaluate that. And then, of course, there are the cases where, in a rational basis review, usually this sort of courtroom fact-finding is not appropriate for judges to engage in. You see in cases such as Bristol Regional, where judges are not supposed to go back and second-guess the fact-finding done by the courts. And even if this court were inclined to defer to what the district court found, the findings were clearly erroneous. The district court, for example, completely ignored the testimony of Dr. Rahman and his experience over in Sweden and other European countries. But, I mean, aren't I right that this treatment for adolescents experiencing gender dysphoria started in the 90s in Netherlands, and it's in 1998 that you first get, I guess we'll call them, WPATH, using the acronym, this kind of set of standards. And I realize they evolve, but that's, you know, 25 years. Isn't it — are we supposed to call this new, experimental, innovative under those circumstances? Two responses, Your Honor. First, back in 1998, Dr. Levine, who actually testified in our favor, pointed out that back then the standards were completely different. None of the minor plaintiffs, as we explained below, would have been able to receive the treatments that they do now under the WPATH guidelines that have been out for just a year. And to look back to how the doctors on the ground in Tennessee are approaching this, the Vanderbilt doctors, for example, have said that they haven't been doing this long enough to know the long-term consequences for kids from hormone therapy, and they said this is particularly true in the pediatric population. Dr. Taylor, who founded the Vanderbilt Transgender Health Clinic, said that everything she has learned from her patients and she's learned from the internet. These are not treatments that have a long history of being provided to minors, especially not minors of the ages of the minor plaintiffs in this case here. Well, so it's — well, a fair point that in 98, for example, hormone treatment was not allowed if you were under 16, if I'm getting it right. And in 2012, WPATH changed it to kind of all adolescents. But I mean, we're still talking about a fair number of years. I mean, how do we judge this? Well, I think it's not for this court to decide on that issue there. I think you defer to the legislative findings and the legislature's judgment about what is appropriate. And look, we're not prohibiting these treatments across the board for everyone, even when they become adults. We're simply delaying these treatments until they reach the age majority and can make that decision for themselves if that's what they want to do and pursue these treatments at that age. But what do you do with the fact that — I mean, that sounds like a reasonable position, let people decide when they're 18. But what about the fact that if you, according to the medical field, in that interim period, there are irreversible changes or potentially irreversible changes and heightened circumstances that — well, circumstances develop that heightens the anxiety and the challenges of the dysphoria? Well, the lack of alignment grows. That's the whole point. And so it makes surgery actually more likely. I think a comparison could be made to the abortion context, Your Honors, where there, if abortion is not performed and the child has carried a term and given birth, that, of course, is a change that you can't unring the bell if someone becomes a mother there. But still, the Supreme Court has said that you defer to the legislative judgments, even about major decisions about whether or not to abort an unborn child. So even though there will be — even though or perhaps because of there will be life-term effects on these minors from these treatments being performed on them, that's even more of a reason to respect the judgment of the state of Tennessee, which is consistent with many other states that have enacted these sorts of laws and with countries like Sweden, the United Kingdom, and elsewhere. I'd also say this is an area where the medical profession really just cannot be the same companies that produce drugs, such as Lupron, have been responsible for the opioid epidemic. A lot of the doctors who write the WPATH and the Nikrin Society Guidelines have financial conflicts of interest, either directly from their practice or from receiving money. Well, so I appreciate that point. I'll maybe even think you're right. But if I should be suspicious of them, where's the medical organization on the other side? Where's the medical organization that says, wait, what are we doing here? Well, I think that the medical organizations that are several in Europe, the national healthcare authorities over the United Kingdom, Sweden, other countries like that, that have essentially restricted these to the research setting or to the most extreme circumstances, that these interest groups in the United States have succeeded in pushing out anyone who opposes what they said. Which of those European entities ban it? So Sweden, for example, as Dr. Roman testified in this recording, has essentially restricted this to the research setting or to the most exceptional circumstances and not to just run-of-the-mind practices as done at places like Vanderbilt. And you can look to as well for the way that WPATH, how radical the approach they have taken to this is that they would set no minimum age even on surgeries being performed on children. And these are just are not organizations that Tennessee has an obligation, especially not a constitutional obligation, to defer to their judgment. It's an obligation. How far does the state's power go? So it's a different question, but can you ban all medical treatments for minors if you decided to? What's the limiting line? Rational basis review, Your Honor. So we would have to have a rational basis for what we're doing. So if there's a novel cancer drug, but you think it has significant side effects for minors, but the FDA has approved it, you could satisfy a rational basis. You could ban it? Yes. The way that the FDA treatment is set up is that if it's approved, the state can still regulate the prescription within the state there as well. The legislature ultimately has the responsibility to look at and see whether or not it's appropriate to prescribe to minors or to others in the state there. And can I ask you about two Sixth Circuit cases really quick? What do you do with Kanu Swensky, the case out of the Sixth Circuit about the taking of blood in essence, and the language that it says that parents possess a fundamental right to make decisions concerning the medical care of their children? Yes. I think you have to look and carefully delineate what the right at stake is. And so in that case, it was the right simply to refuse the medical treatment. That's different from the state regulating the medical practice and saying that this treatment is just not appropriate to offer with our state. So that's a distinction there between Kanu Swensky and our case. And then my second question is in the equal protection context. What do you do with Smith, our Sixth Circuit case that talks about interpreting Title VII consistent with I think consistent with this court's stay opinion? I don't think Smith moves the needle because that was more about the stereotypes about how individuals might act in the workplace. But biological distinctions between the reproductive system of males and females, that's not a stereotype. That would have been understood under the equal protection clause to be the very between a male and a female. And when you have medical treatment that we're attempting to regulate here to protect in sexes, it would be relevant there. It's not discriminatory to simply say that we can regulate this practice just as in Gdaldig or in Dobbs. So that's a distinction between this case and Smith. And I think it's really just difficult and the other side has very little to say that you could fashion a rule that would both strike down this sort of law or prevent Tennessee from enforcing it, but also allow Tennessee to enforce an abortion law, which would, of course, reference female, woman parts of the female reproductive system. So the logic of Dobbs and Gdaldig really forecloses that key equal protection argument. Can I ask you one other question? What are you, are you asking us both to find no standing and to decide the other issues? I see my time's getting ready to go out, but I'll address the question. Yes, this court can address both, especially the merits and then also on the standing issue for standing to seek a preliminary injunction. As in Arizona v. Biden, that's also treated as a merits question for purpose of the preliminary injunction, whether or not the PI would remedy. Why would doctors worry about liability if a statute had been declared unconstitutional, therefore showing they had a constitutional right to deliver the medical service? That just seems funny to me. Well, there's the private cause of action that would remain in place, and that could be brought in a state court. Yeah, no, I'm making the point. Wouldn't a court say, whether state or federal, that if the federal constitution gives you a due process or equal protection right to provide a gender transition service, it's strange to worry about liability. I mean, I don't understand how the state could still make someone liable during the time the statute was found invalid. That seems weird to me. Even though the right of action is not at issue. I mean, do you get the point I'm making? I understand the point, but looking at what Vanderbilt did in fact do is they did not restart treatment during that time period. It appears, and that was there in the way maybe below, is that regardless of how this case goes, they have no intention of reentering this field of treatment for minors. What about the declaration that was filed? So, as we pointed out in the declaration, it did not clarify what they would do if the private right of action remained in effect. And that's something that we had a right to bring them into court and to ask them questions about that and what they planned on doing. It was the plaintiff's obligation to show that Vanderbilt would have restarted treatment if a preliminary injunction issued. We disagreed with their view of that, and we were proven to be correct there. Unless there further questions, I'll return for rebuttal. All right. Thank you, Mr. Hildebrandt. Who's going first here? Good afternoon, Chief Judge. This is Chase Strangio on behalf of the private plaintiffs at Hallease, and I'll be going first. Okay. Welcome and good afternoon. Thank you. Good afternoon. May it please the court. Chase Strangio on behalf of the private plaintiffs at Hallease. I want to begin with the equal protection claim focusing on the law's sex classifications. This court correctly noted in its stay opinion that it is impossible to ban treatment related to gender transition without mentioning sex. But that is a reason to apply heightened scrutiny here, not avoid it. And this is a law that does more than just mention sex. It imposes differential treatment on the basis of sex. Can I ask you about one reason for pause, at least for me, in importing Title VII approaches to discrimination to the equal protection clause? Is this oddity that it has a bait and switch quality to it? Because once you pull the Bostock reasoning into the Constitution, you leave behind the defenses that exist in Title VII. And that just seems to me, it seems very hard to unravel that is, I guess, what I'm getting at. So I'm not even really focused on the differences in language. There are lots of them. But I'm just assuming for the sake of argument, you're right that the anti-discrimination principles are similar. It's quite bothersome to me that there's no package that comes with it about these explanations, reasonable explanations for doing what these employers are allowed to do. Are we supposed to create those defenses under the Constitution? Would that be for us to do? So here are your two responses. I want to first respond and give you a way to, I think, understand the classification here without even relying on the reasoning of Bostock, and then answer, I hope, your question about where the different liability concerns come in. But here we have a line, even if we aren't using the reasoning of Bostock or of Smith, where in order to know if the treatment is prohibited, you need to know the individual's birth sex. And because of that, separate and apart from Bostock's reasoning, that this is a sex classification, and for that reason, it triggers heightened scrutiny. And under BMI, all sex classifications today get heightened scrutiny. And if I could offer just a quick example to explain that, I think that may help underscore how this is a straightforward sex classification, and then we can get to the Bostock question. I'll just deal with this straightforward point you're making. This exact argument was made in Obergefell. The court did not embrace this argument in Obergefell, which is very striking since Bostock had in front of it discrimination against gay and lesbian individuals and discrimination against transgender individuals. They were conspicuously silent on this point. So at a minimum, it doesn't seem obvious that this is the right rule for the Equal Protection Clause. Yeah. I agree with you that in Obergefell, they didn't rule on a sex classification. Here, what I think is different is if you look at the plain text of the statute, you need to ask the question, what is your birth sex, to know whether the treatment is prohibited. So taking our client, for example, Ryan Rowe, who has a birth sex of female, gender identity of male, he and his parents go to the doctor after years of psychotherapy that's unsuccessful. The doctor recommends masculinizing hormone treatment, testosterone, for Ryan Rowe. So you know the next question is Dobs and Godeldig. What do we do with that point? So I'm going to answer that question with this continued hypothetical, because I think that this case is fundamentally different from Dobs and Godeldig in two ways. First, in Godeldig, the central question in the classification was, are you pregnant? That was what was the here. By contrast, the question is, what is your birth sex? And so using my Ryan Rowe example, he goes to the doctor, birth sex, female, gender identity, male. Let's call another person, James. James has a birth sex of male, gender identity male, same age as Ryan, but he's a late bloomer. And he's going through puberty late. He's shorter than his peers. He has a lot of distress. And his endocrinologist says, you know what, we recommend masculinizing testosterone treatment for you. And for James, James can get the treatment because his birth sex is male. Ryan cannot get the treatment because his birth sex is female. The question is, what is your birth sex? And another way to understand the question is, is your gender identity different from your birth sex? But you still need to know the birth sex in order to understand the question. So, if this court disagrees that this is a facial classification, it's different from Godot in a second way, which is here we have in the legislative findings themselves an intent to regulate sex. And this is codified in the Tennessee Code now at 6833 101 subsection M. And the legislature says, we have an interest in having minors appreciate their sex and prohibiting procedures that would cause them to be disdainful of their sex. We don't need to go to the legislative history. I'm sorry to interrupt you. Doesn't that apply equally to both? So, why wouldn't we just say that applies equally to both sexes? So, two responses, Your Honor. A law that applies equally to both sexes still is a law that triggers heightened scrutiny. The court has been clear that equal application of a law does not somehow make it less. The fact that it applies equally to both sexes does not immunize it from heightened scrutiny because the Equal Protection Clause extends its protection to any person. And so, the question is, when we're assessing a classification, we're doing so at the we do so at the level of the group to make the classification, then we analyze it from the individual's perspective. Am I thinking about that wrong? I don't think we can square that with JB, for example, because in all of the Batson challenge cases, if we did it at the group level, in JB, for every man that was struck, there was a woman that was struck. It applied equally to the group. It was the fact of taking sex into account at the individual level. And so, all of the Batson challenge cases, Howard v. Ohio being another one, I think tell us that it's at the individual level. Sorry, just one final question on this. Any classification that applied equally to men and women, we would still apply a heightened level of scrutiny? Because at the time, the state's doing something, it's doing it to an individual. Isn't that the ramifications of that? Go ahead. So, I do think if there's a facial classification that treats people as individuals disparately based on their sex, then yes. And I think that comes from a combination of JB and NVMI. And I think that that is the Supreme Court rule that if there is disparate treatment at the basis of sex, then heightened scrutiny applies. But how would this be individual treatment on the basis of sex if we're saying all people are not entitled to care A, whatever that care is? I think what we're saying is that nobody can get care that's inconsistent with their birth sex. In order to answer the question at the individual level, you need to know the individual's birth sex. Coming back to my Ryan versus James example, the difference between Ryan and James is their birth sex. I take it you agree the same analysis would apply to a ban on surgeries for adolescents? The same whether heightened scrutiny would apply to a ban on surgeries? Yes, if it was in this statute, yes, it was a facial classification, then yes, it would apply in the context of a ban on surgeries. If it was a ban just on surgeries, if there was a different line drawing that was done by the legislature, it may be something that didn't fail heightened review. But I mean, just to spin it out, I mean, it puts judges in this remarkable line drawing enterprise of, okay, 13, we'll say it's okay to ban surgeries, 14, maybe, 15, 16, we're getting nervous. I mean, how do you draw that line? You say, oh, you just play heightened review. Well, I think you know what that means. It means judges sorting it out. And I have no idea how to make that decision. Well, I think in this case, so two responses. I think that under heightened scrutiny, we look at whether or not the means chosen substantially advances the goals that the state has claimed that they're advancing. Here, the record shows that there's a voluminous record here that to respond to some of the things that my friend raised. The record shows, for example, that the great weight of the evidence shows that the impact on fertility is not the same as what Tennessee had claimed in the legislative findings and here today, but rather that a majority of individuals retain their fertility and that there were options for fertility preservation. So I think that heightened scrutiny applies. And as we know, strict scrutiny isn't even fatal. In fact, this level of review is not fatal. In fact, but it is, in fact, the province of the courts to step in when individual constitutional rights are at stake. And Justice Gorsuch, I think his concurrence in South Bay United Pentecostal sort of responded to this. Judges are not scientists, but neither can they abandon the responsibility when individual constitutional rights are at stake. And we think here, the record shows that the weight of the evidence is clear. Those findings were not clearly erroneous. And we respectfully ask that the state be lifted and the preliminary injunction be affirmed. One quick question. Going back to Judge Sutton about taking the Title VII standard, but losing the defenses, would consideration of the types of things that are recognized offenses in Title VII, would consideration of those types of concerns go into the weighing analysis or would they just be abandoned altogether? Thank you, Judge White. I'm glad that you brought me back to the actual question from earlier. And that's exactly what the application of heightened scrutiny is for, is to balance those types of interests. And perhaps Justice Gorsuch's concurrence in SFFA is instructed here, where he had criticized the Supreme Court precedent in the equal protection and Title VI context for, in essence, in forwarding the strict scrutiny balancing into Title VI's strict liability. But of course, the balancing that we have under all the levels of scrutiny allows us to consider those liability concerns that you have in the statutory frameworks. Okay. Thank you. We'll hear from Ms. Schwabauer, if I got it right. Yes, Your Honor. Thank you. Thank you. It's wonderful to have the government here. So thank you, and we look forward to hearing from you. May it please the Court, Barbara Schwabauer for the United States as athlete. This Court should affirm the District Court's decision to grant a preliminary injunction. I'm happy to answer any of the panel's questions, but I wanted to get started by looking back on the question of whether or not SB1 discriminates on the basis of sex, given that it treats male and female minors the same when you ask the question, can any minor obtain a transition in medication? And there are a few under the Equal Protection Clause analysis from this perspective. The first is it doesn't look to the exact unit that is being regulated under SB1. SB1 defines the medical procedures that it regulates as the administration or prescription or administration of puberty blockers and hormones. That is on the face of the statute itself in Section 10325B. But when you're looking into whether or not the statute discriminates against both male and female children, you have to ask the question whether or not male and female children are treated the same with respect to puberty blockers and hormones. And as my co-counsel mentioned, they simply are not. But if you look at whether or not... When you say they're not, you mean they're not with this reference to the specific drugs, but it does seem like they're treated the same when it comes to access to some treatments for gender dysphoria. Not all, but some. I think that if you're asking that question, then yes, they're treated the same. But that's the question is what's wrong. That question bakes the classification that's in the statute into the analysis under the Equal Protection Clause. The question of the Equal Protection Clause is, are male and female minors treated alike under SB1? And it takes the sex classification that's in SB1 and beats it into what is actually being regulated and then ask the question. And if you analyze it from that perspective, any facially discriminatory policy could be described in a way that makes it non-discriminatory on a particular basis. That's why the United States, in our brief, we pointed to the racial integration example. At the individual level, it's a student being denied access to a school on the basis of their race. But if you say the question is, well, no student can go to a racially integrated school, then there is no discrimination on the basis of race. And you could do the same thing with VMI. You could say VMI... It sounds so easy. How did the court miss this in Obergefell? Well, I think the difference from Obergefell is that here we're talking about, as Mr. Strangio pointed out, a facially discriminatory statute on the basis of sex. This statute makes... Wait, I mean, I can't believe that's the answer. Forgive me. But, I mean, Bostock is about the same, treating both forms of discrimination exactly the same in this textual way. So I'm not sure I understand how you can say the Obergefell didn't implicate the same analysis I'm puzzled by that. Well, I don't think that it wouldn't necessarily implicate the same analysis, that the court declined to do so doesn't mean it wouldn't have applied there. I got it. But it's not easy, is my point. You're making it seem as simple as the word sex is there. And we not only have Dobbs and Geduldig, we have a court that was motivated to find discrimination and didn't pick this route. And that does speak volumes to me. And my point, Your Honor, is that it's not just the fact that there are sex-based terms here. It's that you cannot understand the obligations under this statute outside of those sex-based terms. It's not that they are simply included like an abortion statute, where it incidentally refers to the gender of a pregnant person. It's the fact that you can understand what's happening under an abortion statute when it's banning abortion. You can understand your obligations there without referencing a person's sex. But with respect to SB 1, you cannot understand the obligations under the statute. How would this work in the surgery setting? I know that's not what was challenged, but it's no longer in the case. But it doesn't seem implausible that if you win on this ground, we'd apply heightened review to surgeries. I think you would agree that's true. Would you? I mean, how would we deal with that? Would it just be 17? Maybe the government hasn't shown the bans reasonable, but at what, 13, 14, we're going to say the ban's reasonable? How would we do this? Well, Your Honor, I think that, again, if it's a discriminatory ban on the basis of sex, which it is, and obviously it's not being challenged here on appeal, then intermediate scrutiny is going to apply. And there is justify a sex-based classification. So again, the court would just be obligated to analyze the surgical procedures here and whether or not it's appropriate that this was the line that was being divided. And as the expert testimony in this case shows in terms of the surgical aspect, it's that there is something of an arbitrary line here because surgeries, like the ones that are contemplated for gender dysphoria, are similar to surgeries that are and without regard to whether or not it carries the same level of risk. So there's certainly no problem with the state regulating surgeries that would somehow implicate the fertility of children, but it isn't doing that equally. It's deciding to do it on the basis of sex. And that's the reason why the statute has a sex-based classification on its face and they have to satisfy intermediate scrutiny. And the state hasn't done so here because as the district court found in its extensive factual findings, the state has not shown that the harms it has alleged are as substantial and prevalent as they have claimed. And they simply have made an arbitrary line drawing decision that wouldn't even satisfy rational basis scrutiny. I see, Your Honors, that my time is up. If you have no further questions for me, again, we ask that this court affirm the district court's decision to grant the preliminary injunction. Thank you, Ms. Schwabauer. Mr. Hildebrand, I think you have a few minutes. Thank you, Your Honor. So the main problem with what plaintiffs and interveners have argued here is that it would completely preclude, as Judge Brasher explained in his concurrence and Agnes Tucker, it would completely preclude the state from looking at the benefits and risks of these treatments, which would vary based on what the sex of the individual is. The interveners, for example, said that, well, this is just the same thing as performing a sterilizing surgery on a child with gender dysphoria as it would be to someone who's intersex. But there's a world of difference between surgically castrating a minor who has otherwise healthily functioning reproductive system and surgically sterilizing someone who does not, just as providing testosterone... Why doesn't that go into the balancing? It goes down to whether or not we are... So the Equal Protection Clause, the main part of it to see whether or not there's discrimination is, are we treating folks who are similar ways? And what's distinct between boys and girls is that biologically, boys need higher levels of testosterone to develop healthily into adults. Girls need higher levels relatively of estrogen to develop healthily there. It's not just with the abortion context. Similarly, where there they claim it's just incidental that you're looking at sex, but when you have the abortion context there, it's of course central to the procedure that's banned that it's banned only for women because only women have that reproductive system there. But here we can look and see how the state is treating the comparable or the comparable treatments for boys and girls. And the state is equally prohibiting the different treatments that are at stake there. The benefit risk profile is different and the state of Tennessee has appropriately addressed that there as well. A few other points. So plaintiff's mission, Jeb, in that case, the government was only striking members of one sex from service on the jury pool and the Supreme Court reason that doing so was a brand of inferiority, basically an idea that someone just couldn't decide objectively in a case involving someone of the same sex as a defendant. That's much different from simply looking at medical treatments and seeing what the benefit risk profile is for regulating those. As one final point, plaintiffs ignore that Tennessee has two prohibitions, one of which also applies to simply anyone with gender dysphoria, which can include non-transgender individuals. So seeing as my time has expired, I urge this court to reverse the district court grant of a preliminary injunction. I'm sorry, can you repeat your last point? I did not get that. So the last point was the Tennessee law actually has two prohibitions. In their briefing and argument, again, they have focused exclusively on the first prohibition. The second prohibition prohibits any hormone or surgical treatment for gender dysphoria that applies regardless of whether or not what the individual's sex is. The Tennessee legislature simply said that these are, this is a mental condition, gender dysphoria, and it's more appropriately treated with treatments such as psychotherapy as opposed to physical interventions such as surgery. Thank you. Thank you. Thanks to all three of you for your excellent arguments and terrific briefs. We need both of them in this challenging case. So we're really grateful. And thank you also for agreeing to do this virtually the Friday before Labor Day weekend, for which we apologize, but we're doing our best here. So thank you very much to all three of you. And we're also grateful that the government as an intervener. So thank you for your excellent brief as well. This case will be submitted and we will go on to one that's related.